NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 190519-U

NO. 4-19-0519

FILED
December 3, 2019
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* O.H., a Minor | ) | Appeal from the |
| (Emily W., | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Macon County |
| v. | ) | No. 16F397 |
| Grady H., | ) | |
| Respondent-Appellant.) | ) | Honorable |
| | ) | James R. Coryell, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's judgment is affirmed where respondent father failed to demonstrate any error in the court's award of child support or its allocation of parenting time.

¶ 2    Respondent, Grady H., appeals the trial court's judgment in paternity proceedings brought by petitioner, Emily W., which calculated his child support obligation and allocated parental responsibilities for the parties' child. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    The record reflects that the parties are the parents of O.H., born on October 8, 2014. They were never married but lived together at the time of O.H.'s birth and for almost two years thereafter. In October 2016, Emily filed a petition for a determination of paternity, asking the trial court to determine that Grady was O.H.'s father, to award her sole decision-making responsibility

for O.H., to award Grady supervised parenting time with O.H., and for other relief it deemed appropriate. In November 2016, Grady filed a response to Emily's petition, admitting that he was O.H.'s father. He also filed a counter-petition for temporary relief, asking the court to allocate parenting time and decision-making responsibility for O.H. to him during the pendency of the proceedings and order Emily to pay temporary child support.

¶ 5       In February 2017, a hearing was conducted in the matter. The record does not contain a transcript of the hearing; however, a docket entry reflects that the parties reached a temporary agreement as to parenting time and that the trial court fixed Grady's temporary child support obligation at $240 per month.

¶ 6       In November 2018, the trial court conducted a hearing on all pending matters and both parties testified at the hearing. The evidence showed O.H. was four years old and the parties' only child together. However, both parties had children from previous relationships. Emily testified she had an eight-year-old child that lived with her part-time. She shared "mostly" equal parenting time with the child's father, but the father had more parenting time during the child's school year. Emily testified she did not pay child support for her older child. Rather, she and the child's father worked together and "split the cost of everything." She described the two as having a good relationship and stated they reached an agreement "outside of court." One of the reasons she agreed to less parenting time with her older child during the school year was because of the "hostile household" she had while living with Grady.

¶ 7       Grady testified that aside from O.H., he had three older children, ages 25, 23, and 18. His 18-year-old child was still in high school, and Grady testified he had always been the custodial parent for that child. Grady also had two grandchildren.

¶ 8    For almost two years following O.H.'s birth, the parties lived together in Pana, Illinois. During that time, Emily was not employed and stayed at home with O.H. She testified she was O.H.'s primary caregiver while living with Grady. In September 2016, the parties ended their relationship and stopped living together. The record indicates Emily and O.H. began living in Decatur, Illinois, where Emily's mother also resided. Grady continued to reside in Pana, where he had lived for most of his life.

¶ 9    Emily testified that in May 2018, she finished school and received a degree in health information and medical coding. On August 27, 2018, she obtained employment at Carle Hospital (Carle) and, shortly thereafter, moved with O.H. to Champaign, Illinois. At the time of the hearing, Emily had been living in Champaign for about one month. She testified her residence was approximately 15 minutes from her work. Also, her new job resulted in an increase in her pay from her previous employment at a Monical's restaurant. Emily worked eight hours a day and five days a week. Occasionally, she worked on the weekends, but testified that weekend work was "optional." Emily testified she had applied to "multiple places" when looking for work after receiving her degree but she was only offered a position at Carle. She acknowledged that she did not tell Grady about her move to Champaign until "the week of" her move.

¶ 10    Shortly following O.H.'s birth in October 2014, Grady began working for Zachary Construction. His job required him to leave Illinois every fall and spring and live and work in Indiana for weeks or months at a time. The parties testified that during the year, Grady was typically in Illinois from January until the middle of February or the beginning of March. He would then leave for work and not return to Illinois until the end of May or the beginning of June. Grady then remained in Illinois until approximately the end of August, when he would leave again for

work. Grady would be gone until approximately the end of October or early-to-mid November. He was in Illinois for the remainder of November and December. When Grady returned to Illinois, he did not work.

¶ 11        Grady testified that in October 2018, he quit his job with Zachary Construction due to concerns that he or other employees would be injured while working. He stated his work usually involved "shutdowns" at "power plants" but, at the time he quit, his employer was having him work "a coal yard job." Grady asserted it was work his employer had never done before and safety concerns arose. After quitting, he learned there was an accident where an employee lost an arm. Despite quitting his job in October 2018, Grady also testified that he intended to return to work for Zachary Construction in February 2019. He stated he had already been offered a position.

¶ 12        The evidence further showed that O.H. was enrolled in a daycare program at Carle, Emily's place of employment. Emily testified she usually dropped O.H. off at daycare between 7:15 and 7:30 a.m. and picked her up at about 5:15 p.m. The daycare program included an "educational program." On cross-examination by Grady's counsel, Emily stated the time O.H. spent in daycare was more important than spending time with Grady, asserting that O.H. "should be learning." Emily intended for O.H. to start preschool in January 2019, or, alternatively, in the fall of 2019. O.H. was scheduled to start kindergarten in August 2020.

¶ 13        After the parties separated, Grady had parenting time with O.H. every other weekend from Saturday to Sunday. In February 2017, the temporary order was entered, and the parties agreed that Grady would have parenting time with O.H. every Thursday night and every other weekend from Thursday to Sunday night. Emily testified that the parties followed the temporary agreement when Grady was "in town."

¶ 14 Emily proposed a parenting plan that would make her the sole decision maker for O.H. with respect to all major issues—educational, medical, and extracurricular. She stated she had always been the primary decision maker for O.H. and chose O.H.'s doctor and dentist, took O.H. to all of her appointments, and facilitated O.H.'s participation in her extracurricular activities. Emily testified Grady had never taken O.H. to any of her doctor or dental visits, nor had he attended any of her extracurricular events. She acknowledged that she did not tell Grady about O.H.'s medical or dental appointments after the parties separated. Regarding O.H.'s extracurricular events, Emily testified that she was "not sure if [Grady] even knew [O.H.] was [involved] in them" because he was "usually gone during that time."

¶ 15 Emily further testified that she "found it difficult to work with" Grady and she did not believe they could work together to make joint decisions for O.H. She explained that she did not "engage in conversation with Grady because it's usually hostile" and involved "a bunch of name calling on his part." The hostility was especially noticeable after the parties first separated. Emily further explained as follows: "I mean, you really can't say anything without him arguing back at you. I just basically didn't talk for the last several years because everything was an argument. I just got yelled at so I just didn't talk."

¶ 16 Regarding the parties' parenting time with O.H., Emily proposed that before O.H. began school, the parties continue to exercise parenting time similar to their current schedule, meaning O.H. would primarily reside with Emily, and Grady would have parenting time every other weekend and one day during the week. However, in an effort to reach a compromise with Grady, Emily agreed to modify her proposal so that during the month of January and for one month in the summer, Grady would have parenting time with O.H. from Sunday through Wednesday each

week and she would have parenting time from Thursday through Saturday. Emily asserted she "worr[ied] a little bit" about the modified schedule because O.H. "very much relie[d] on schedule and predictability." Emily proposed that after O.H. started school, Grady have parenting time every other weekend. She stated that parenting time for Grady during the week would no longer work due to "the distance" between the parties.

¶ 17        Emily further proposed that Grady would not exercise parenting time with O.H. when he was out of town for work and that, during the summer, each parent would have one uninterrupted week of parenting time with O.H. Additionally, the parties would exercise an "every other holiday schedule, 9 a.m. to 5 p.m." except for Christmas, when each party would have O.H. for a 24-hour period. Emily further requested that the parties meet halfway between their residences in Forsyth, Illinois, when exchanging O.H.

¶ 18        Emily agreed that while the parties' temporary parenting order was in effect, there were times that Grady sought extra parenting time with O.H. She testified she agreed for Grady to have visitation with O.H. the weekend of her move to Champaign, stating that he called her and had "just got back from work." Emily testified Grady also called and wanted parenting time with O.H. when his grandmother died, and she agreed. She testified there was an occasion when she traveled to Louisiana with O.H. to visit her sister and her sister's new baby. Emily acknowledged that she did not tell Grady about the trip, stating "[h]e was gone at work." She denied ever trying to keep O.H. away from Grady.

¶ 19        Grady proposed a parenting plan under which he had O.H. during the months that he was not working for Zachary Construction until O.H. started kindergarten. He believed it was more important for O.H. to be with a parent than in daycare. Grady testified that O.H. got along

with him and his other children. He recalled going to a doctor's appointment with O.H. when he and Emily were still together. Grady stated he would go to other appointments with O.H. if given the opportunity.

¶ 20    Grady also described difficulty he experienced with Emily when requesting time with O.H. on her most recent birthday. He stated that after quitting his job in October 2018, he texted Emily to ask if he could surprise O.H. by picking her up from daycare on her birthday. According to Grady, Emily denied his request, stating Grady was "not going to tell [her] what to do," and he was "not going to come in and interrupt [their] lives." Grady stated their discussion "went on for a good hour" with him "begging" to see O.H. on her birthday because he had "not got to see [O.H.] on her birthday since she was born." On cross-examination by Emily's counsel, Grady acknowledged that he ultimately received parenting time with O.H. on her most recent birthday. He testified O.H.'s birthday was Monday, October 8, and he had parenting time with her from the Sunday before her birthday until the Tuesday after.

¶ 21    Ultimately, Grady testified that he believed the parties could work together to make joint decisions regarding O.H. He asserted he had "no problem working with [Emily]."

¶ 22    Evidence further showed that in February 2017, Grady was ordered to pay Emily $240 per month for child support. Both parties agreed that the calculation of child support at that time was based on unemployment compensation Grady was receiving rather than income he earned while working for Zachary Construction.

¶ 23    The parties also submitted financial affidavits in the case. Emily identified the affidavit she submitted and testified it was accurate as to her current income and expenses. She reported gross monthly income, including child support, of $2628.27; monthly deductions for

taxes, mandatory retirement contributions, and insurance of $683.32; monthly living expenses of $2043.69; and monthly debt payments of $88. Further, Emily explained that O.H.'s daycare at Carle cost $200 per week; however, she received a subsidy from the State to assist her with the cost and, as a result, paid only $100 per week. Emily testified O.H. had to attend daycare at least three days per week or she would lose the subsidy. She further explained that she also paid $30 a week in "backpay" associated with O.H.'s previous daycare. Additionally, she carried medical, dental, and vision insurance for O.H., and paid $110 per paycheck for both O.H. and herself. Emily testified she paid those expenses on her own and had not received any help from Grady.

¶ 24        Grady agreed that he voluntarily quit his job in October 2018, and that the financial affidavit he submitted to the trial court in November 2018, reflected that he had no income. He did report that his gross income for the previous year, 2017, totaled $59,732. Grady further reported total monthly living expenses of $1737 and no monthly debt payments. The record reflects Emily submitted Grady's November 2017 pay stubs from Zachary Construction into evidence, reflecting that his "TOTAL PAY" for 2017 was $71,850.11 and his "NET PAY" after taxes and deductions was $60,620.04.

¶ 25        At the conclusion of the hearing, the trial court took the matter under advisement. It also asked the parties to submit written proposals regarding parenting time. The parties submitted plans that were essentially consistent with their testimony at the hearing. Grady proposed that he have parenting time with O.H. "full-time during the periods he is off work." Emily requested that she have the majority of the parenting time with O.H. and that, when not working, Grady have parenting time with O.H. every other weekend and two days per week during the months of January and July. She proposed that, after O.H. started kindergarten, Grady have parenting time every

other weekend. Emily also argued as follows:

> "The reason that parenting time should not be anymore [*sic*] than [her recommendation] is because [Emily] receives state aid with the daycare. In order to maintain the state aid [Emily] must have [O.H.] in the daycare at least three days per week. With the distance between the [parties'] residences it is not really feasible to have anymore [*sic*] weekday parenting time."

Emily also submitted a support obligation worksheet, proposing that Grady pay child support of $632.61 a month, monthly daycare expenses of $382.56, and monthly insurance expenses of $58.44. On the worksheet, she identified Grady as having gross monthly income of $5183, a "Standardized Net Income" of $3967, and an "Adjusted Net Income" of $3344.50.

¶ 26        A December 2018 docket entry reflects the trial court removed the case from advisement, stating as follows:

> "Finding the parenting plan submitted by [Grady] is unrealistic and that it provides for multiple months with [Grady] when the parties live in different cities. The plan may be workable in the very short term. However, once the child starts school it will be totally unworkable. Court adopts the parenting plan submitted by [Emily] with the exception that each party is awarded [three] weeks uninterrupted parenting time each summer."

Consistent with Emily's proposal, the court also fixed Grady's child support obligation at $632.61 per month, beginning December 2018. Additionally, it ordered him to pay monthly daycare expenses of $382.56, and monthly health insurance expenses of $58.54.

¶ 27        In January 2019, the trial court's written judgment was filed. As indicated in its

December 2018 docket entry, Emily was allocated major decision-making authority over O.H. Additionally, the court allocated parenting time consistent with Emily's proposed plan, designating her as the parent with the majority of the parenting time and setting forth Grady's parenting time with O.H. as follows:

> "(Before the child starts school) Every other weekend Friday at 6pm to Sunday at 6pm[.] For the months of January and July[,] [Grady] will have two overnights per [week] during the weekdays.

> (After the child starts school) Every other weekend Friday at 6pm to Sunday at 6pm[.]"

¶ 28    In March 2019, Grady filed a motion for reconsideration of the trial court's judgment. He argued the court improperly based its child support order on his previous wages "with no basis therefore." Grady also challenged the court's order that he pay daycare and medical insurance expenses, noting his testimony at the hearing that he was unemployed. Finally, he argued that the court erred in its allocation of parenting time. In June 2019, the trial court conducted a hearing in the matter and denied Grady's motion.

¶ 29    This appeal followed.

¶ 30                                    II. ANALYSIS

¶ 31                        A. Appellant's Presentation of Facts

¶ 32    On appeal, Grady challenges both the trial court's child support order and its allocation of parenting time. Initially, however, we must address deficiencies in Grady's appellant's brief with respect to his recitation of the facts of the case.

¶ 33    Illinois Supreme Court Rule 341(eff. May 25, 2018) sets forth requirements for the

form and content of appellate court briefs. Pursuant to Rule 341(h)(6) (eff. May 25, 2018) an appellant's brief must have a "Statement of Facts, which shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal ***." An appealing party's brief must also contain an "Argument" section, which sets forth "the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). "The rules of procedure concerning appellate briefs are not mere suggestions, and it is within this court's discretion to strike [a] brief for failing to comply with Supreme Court Rule 341." *Crull v. Sriratana*, 388 Ill. App. 3d 1036, 1045, 904 N.E.2d 1183, 1190, (2009).

¶ 34        Here, Grady's statement of facts consists of a single paragraph with only the barest description of the relevant factual circumstances of the case and *no* citation to the appellate record. Significantly, he fails to reference the relevant November 2018 evidentiary hearing, describe the testimony and evidence presented by the parties at that hearing, describe any findings of the trial court, or set forth the contents of the orders he challenges on appeal. Grady essentially failed to present any facts necessary to an understanding of the case and the issues he raises on appeal.

¶ 35        Additionally, while the argument section of Grady's brief does contain descriptions of evidence presented in the case along with citations to the appellate record, we note that some of Grady's assertions of fact are inaccurate and are not supported by the portions of the record to which he cites. For example, Grady repeatedly asserts in his brief that the evidence showed Emily "moved several times" with O.H.; however, the record indicates only two moves by Emily—one when she and Grady separated and one after she obtained employment at Carle. The portions of

the record cited by Grady for this "fact" also correspond to *comments* Grady made at the hearing on his motion to reconsider rather than *evidence* presented at the November 2018 evidentiary hearing. Further, those comments by Grady also reference only two moves by Emily, not "several."

¶ 36    In another instance, Grady asserts he "was unable to testify about his care for [O.H.]," indicating that he was somehow prevented from providing testimony on that specific subject. However, he cites to a portion of the record pertaining only to an objection by Emily's counsel to his testimony about the "custody" and care of his older children—not O.H. The record reflects the trial court ultimately determined that Grady's "parenting skills" had not been challenged by Emily, and Grady's counsel agreed to "move on" to another subject.

¶ 37    Grady next argues that Emily "gave up custody" of her older child, that she "just gave up her other [child]," or that she exercised only "summer parenting time" with that child. None of these assertions are accurate and the portion of the record Grady cites does not support his description of the evidence. Instead, the record shows that Emily testified her older child lived with her "[p]art-time." She asserted parenting time with that child "mostly equal[ed] out," but acknowledged that the child's father had more parenting time during the school year.

¶ 38    Finally, Grady contends in his brief that "[e]ven the trial court noticed [Emily's] argumentative nature." However, the portion of the record he cites describes an objection by Emily's counsel to his counsel's cross-examination of Emily. The basis of the objection was that counsel's *questioning* was "argumentative," not Emily. The record contains no description or finding by the trial court as to Emily's "nature."

¶ 39    In this instance, Grady clearly failed to comply with Rule 341 in his presentation of the underlying facts. Additionally, he made repeated assertions in the argument portion of his

- 12 -

brief that were either unsupported or refuted by the appellate record. Although it is within our discretion to strike Grady's brief for his failure to comply with Supreme Court Rule 341(eff. May 25, 2018), we decline to do so in this instance. Instead, we remind Grady that compliance with Rule 341 is mandatory and disregard the portions of his brief that are not supported by the appellate record.

¶ 40                                B. Child Support

¶ 41        On appeal, Grady argues the trial court erred in its calculation of child support. He challenges the trial court's calculation of his income and argues that it failed to consider evidence that Emily incurred "extra expenses" as a result of "her moves."

¶ 42        The Illinois Parentage Act of 2015 (Parentage Act) provides that judgments involving an adjudication of parentage "shall contain or explicitly reserve provisions concerning any duty and amount of child support ***." 750 ILCS 46/802(a) (West 2018). "[I]n determining the amount of a child support award, the [trial] court shall use the guidelines and standards set forth in subsection (a) of Section 505 and in Section 505.2 of the Illinois Marriage and Dissolution of Marriage Act [(Dissolution Act) (750 ILCS 5/505(a), 505.2 (West 2018))]." *Id.*

¶ 43        Section 505(a)(2) of the Dissolution Act provides that "[t]he court shall determine child support in each case by applying the child support guidelines [as set by the Illinois Department of Healthcare and Family Services] unless the court makes a finding that application of the guidelines would be inappropriate, after considering the best interests of the child ***." 750 ILCS 5/505(a)(2) (West 2018). Further, child support is calculated, in part, by determining "each parent's monthly net income." *Id.* § 505(a)(1.5)(A). Under the Dissolution Act, " 'net income' means gross income minus either the standardized tax amount *** or the individualized tax amount," and

- 13 -

minus other specified "adjustments." *Id.* § 505(a)(3)(B). On review, we consider whether the court's child support order "is an abuse of discretion or the factual predicate for the decision is against the manifest weight of the evidence." *Slagel v. Wessels*, 314 Ill. App. 3d 330, 332, 732 N.E.2d 720, 721 (2000).

¶ 44        As stated, Grady argues that the trial court erred in calculating child support because its calculation was based on an erroneous determination that he worked "full-time in a calendar year." Grady points out that the evidence showed he worked "periods of time" and was then "laid off" for periods of time. He also contends that the court failed to consider that "many of the extra expenses incurred by Emily were a direct cause of her moves."

¶ 45        First, we find nothing in the record that shows a determination by the trial court that Grady worked a full calendar year without periods of time in which he was laid off. Rather, the record indicates child support was calculated based on Grady's yearly income from his employment with Zachary Construction in 2017, which was averaged into a monthly figure. According to Grady's testimony, his work schedule was substantially the same in 2018, except for the fact that he quit a job he was working for his employer in October 2018 and returned home a few weeks early. Nevertheless, Grady also asserted that he intended to resume working for Zachary Construction in February 2019, consistent with his usual work schedule.

¶ 46        Further, at the evidentiary hearing, Emily submitted Grady's pay stubs showing his earnings for 2017. She also submitted the support obligation worksheet relied upon by the trial court in determining Grady's child support obligation. That worksheet identified Grady's gross monthly income as $5183, resulting in a gross yearly income of $62,196. The figures submitted by Emily were in line with Grady's report of his 2017 yearly earnings on his financial affidavit

- 14 -

($59,732) and actually less than figures reflected in Grady's 2017 pay stubs ($71,850.11 "TOTAL PAY"; $60,620.04 "NET PAY").

¶ 47    Second, in his brief, Grady neither references nor cites to the actual figures relied upon by the trial court when calculating child support, nor does he identify or cite any figures he submitted to the court for consideration. Moreover, on appeal, Grady fails to identify either the income figure he believes the court should have used when calculating child support or the "extra expenses" Emily incurred that were solely the result of her moves. Given these failures, we can find no merit to Grady's assertions that the trial court erred in calculating child support.

¶ 48    Finally, Grady further suggests on appeal that the trial court erred in calculating child support because it also erred in allocating parenting time. For the reasons that follow, we find no merit to his claim of error as to the allocation of parenting time and, consequently, no merit to his challenge to the court's child support award.

¶ 49                               C. Parenting Time

¶ 50    On appeal, Grady argues the trial court erred in its allocation of parenting time, asserting the court should have awarded him the majority of parenting time with O.H. "while he was home from work on periods of lay-off." He also contends the court erred in its allocation of parenting time by failing to consider relevant factors, including that O.H. had not yet started school; Emily's negative attitude toward Grady; and Grady's "significant" involvement in O.H.'s life.

¶ 51    Under the Parentage Act, the trial court is required to apply standards set forth in the Dissolution Act when allocating parenting time. 750 ILCS 46/802(a) (West 2018). Pursuant to the provisions of the Dissolution Act, the court must "allocate parenting time according to the

child's best interests." 750 ILCS 5/602.7(a) (West 2018). When determining the child's best interests, a court should consider all relevant factors, including the following:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent

directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender ***;

(16) the terms of a parent's military family-care plan ***; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b)

¶ 52     "Although a trial court must consider all relevant factors when determining the best interests of a child, it is not required to make an explicit finding or reference to each factor." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43, 80 N.E.3d 636. "Generally, we presume that a trial court knows the law and follows it accordingly." *Id.* Further, "[b]ecause the trial court is in the best position to assess the credibility of witnesses and determine the child's best interests, its decision regarding the allocation of parenting time must be accorded great deference." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15, 97 N.E.3d 566. On review, the trial court's decision will not be overturned "unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence." *Id.*

¶ 53     Here, the trial court allocated the majority of parenting time to Emily and rejected

- 17 -

Grady's proposal that he have the majority of parenting time with O.H. during the periods of time he was not working. In reaching its decision, the court determined that Grady's parenting plan was "unrealistic" given that the parties lived in different cities and "totally unworkable" in the long term once O.H. started school. After reviewing the record and the relevant factors for consideration, we find no indication that the court ignored relevant factors or evidence, and no error in its ultimate decision.

¶ 54    The record shows both parties desired a majority of the parenting time with O.H. At the time of the hearing, Emily had O.H. the majority of the time and the evidence indicates she had acted as O.H.'s primary caretaker both while the parties resided together and after they separated. Grady testified that O.H. got along well with him and his older children but offered no evidence establishing him as her primary caretaker. Further, as Grady acknowledged, his employment with Zachary Construction required him to work outside of Illinois for weeks or months at a time. No evidence was presented regarding visits or contact he had with O.H. during his absences from the state. Further, Grady acknowledges on appeal that "there is no doubt that during [his] employment sessions he would not be able to care for [O.H.] ***."

¶ 55    As noted by the trial court, the parties also resided in different cities. Although Grady suggests Emily's move to Champaign was intended to frustrate his relationship with O.H., the record demonstrates otherwise. The evidence shows that the parties had already been living in different cities at the time of Emily's move and that her purpose in moving was to pursue a better employment opportunity. Specifically, she moved to Champaign with O.H. after obtaining a job with Carle, which was in her field of study and increased her rate of pay over her previous employment. Additionally, while Emily worked full-time, O.H. attended daycare at Carle. Emily

received a state subsidy that reduced her daycare costs by half; however, the subsidy was conditioned upon O.H. attending her daycare at least three days a week. Given the distance between the parties, O.H.'s daycare expenses would have doubled under Grady's proposed plan.

¶ 56     Finally, to the extent that Grady argues Emily was unwilling to place O.H.'s need for time with both parents above her own desires or to facilitate a relationship with Grady, we, again, find that the record demonstrates otherwise. Grady complains that Emily failed to provide him with information regarding O.H.'s medical and dental appointments or her extracurricular activities. However, no evidence was presented that Grady ever expressed a desire for, or attempted to obtain, such information and was thwarted by Emily. Further, Emily's testimony indicated O.H. had been engaged in extracurricular activities only during periods of time when Grady was working and out of state—periods of time when Grady admittedly could not exercise parenting responsibilities.

¶ 57     Additionally, the record contains evidence of Emily's efforts to compromise with Grady regarding parenting time. Specifically, Emily testified to instances when she agreed to Grady having additional parenting with O.H. outside of the parties' temporary schedule. She also stated she agreed to modify her parenting plan proposal to give Grady extra weekly time with O.H. in January and July—two months when Grady was typically not working. Also, even though Grady testified he had difficulty communicating with Emily when attempting to see O.H. on her most recent birthday, the record reflects that he ultimately exercised parenting time with O.H. from the day before her birthday through the day after. Accordingly, while the record supports a finding that the parties had a difficult and contentious relationship, it does not show that Emily exhibited an unwillingness to place O.H.'s needs above her own or to facilitate a relationship between O.H.

- 19 -

and Grady.

¶ 58        Notably, on appeal, Grady does not argue that the trial court erred in finding that his proposed parenting plan would be "unworkable" in the future when O.H. started school. Given the evidence presented, we also find no error in the court's ultimate rejection of Grady's proposal in the short-term.

¶ 59                              III. CONCLUSION

¶ 60        For the reasons stated, we affirm the trial court's judgment.

¶ 61        Affirmed.